**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| Brett Filous, | ) | CASE NO.  1:18 CV 626 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| vs. | ) | |
| | ) | |
| Sgt. Alan Dunbar, et al., | ) | <u>Memorandum of Opinion and Order</u> |
| | ) | |
| Defendant. | ) | |


**<u>Introduction</u>**

This matter is before the Court upon defendant Officer Samuel Scott Phillips's Motion for Summary Judgment (Doc. 74) and defendant Trooper Chad Schell's Motion for Summary Judgment (Doc. 76).  This is a § 1983 action arising out of the arrest of plaintiff. For the following reasons, both motions are GRANTED.

**<u>Facts</u>**

Plaintiff Brett Filous filed his Amended Complaint against moving defendants Trooper

1

Chad Schell (in his individual and official capacity[1]) and Officer Scott Phillips. Other named defendants have been previously dismissed.[2] The Amended Complaint asserts three claims. Two remain pending: Count One alleges assault and battery and use of excessive force pursuant to 42 U.S.C. § 1983, and Count Three alleges wanton and reckless conduct.[3]

Plaintiff's deposition testimony offers his version of the facts as follows. As of the date of the incident herein, March 30, 2016, plaintiff lived with his mother in Seville, Ohio. Plaintiff had been recently separated from his wife and was not working. Plaintiff characterized himself as depressed and an alcoholic who had previously attempted suicide. On that date, plaintiff awoke around 5:30 a.m. and left his house within an hour. He took his mother's car (a Ford Explorer) and her firearm and ammunition with him. Plaintiff intended to kill himself with the gun that day after getting drunk enough to do it. He stopped at a Speedway and stole a 24 or 30 pack of beer. He found a parking lot, parked his car, and started drinking beer in his car. He drank for an hour or two and "got through at least half"of the beer. As the parking lot began to become more occupied, plaintiff left to find an empty parking lot. He was intoxicated at this point. There was an empty parking lot with a vacant business near the intersection of Route 3 and 224 in Seville. Plaintiff parked there for a couple hours, drinking and listening to the radio. Plaintiff was getting low on gas, so he went

---

[1]     By Memorandum of Opinion and Order, this Court previously dismissed any official capacity claims against this defendant. (Doc. 33)

[2]     Other defendants named in the Amended Complaint were Sgt. Alan Dunbar, Officer Andrew Blubaugh, and Sgt. English.

[3]     Count Two (intentional and/or negligent infliction of emotional distress) has been dismissed.

2

to Wayside Market. He went inside, got some more beer, and asked the female cashier for cigarettes.  As she retrieved the cigarettes, plaintiff pulled out his gun, pointed it at the cashier, and started yelling at her to turn the gas pump on. He then ran out of the market with the beer and got into his vehicle. After he got onto the road on Route 3, he noticed the police were behind him. He pulled off the exit ramp at Route 224 and stopped the car. Using a bullhorn, the police repeatedly called plaintiff by his name and told him to exit his vehicle.  He did not do so. He continued to drink his beer.  Plaintiff had to urinate.  He decided to exit the vehicle to do so and then get back in to figure out what he was going to do.  He then opened the driver's side door and began to urinate. The gun was in the car on the front seat or front floor. The next thing plaintiff recalls is being in the ambulance. Plaintiff recalled nothing between the time he exited his car to urinate and when he was in the ambulance en route to the hospital.  (pltf. depo.)

Defendant Seville Police Sergeant Phillips submits his affidavit which avers the following. He was dispatched to the Wayside Market regarding an armed robbery call where the individual had pointed a firearm at several people. Officers Phillips and  Fockler pursued the suspect's vehicle which ultimately pulled over onto the right shoulder forward of the entrance ramp on eastbound I-76. Both officers's cruisers had dash cameras which recorded the incident. Fockler's vehicle stopped directly behind the suspect which came to be known as plaintiff. For 45 minutes, Officer Fockler repeatedly instructed plaintiff to come out of the vehicle with his hands up so that he could be peaceably taken into custody. Plaintiff did not acknowledge the officers's presence during this time.  Also during this time, Phillips was advised through dispatch of plaintiff's identity and that he had mental problems and an

3

attempted suicide history, and that a "be on the lookout" (BOLO) call had been put out for him throughout Medina County earlier in the morning. At about 51 minutes into the stand-off, plaintiff exited the vehicle and began urinating just outside the driver's door, with the front of his body facing away from the police officers. By that time, a perimeter had been established using mutual aid agencies and traffic had been stopped in both directions on I-76.  Without any forewarning, Ohio Highway Patrol Trooper Dunbar rushed forward to take down plaintiff. When Phillips saw the take down, he had to secure his rifle in his cruiser, close the driver's door, and proceed to where plaintiff was located to assist in the apprehension. In his previous deposition testimony, Phillips states:

> A.  Once he was on the ground, I - myself and several officers approached him on the ground.  His arms were underneath him.  I felt that there was a firearm still possibly on him.  Wanted to get his right arm out from underneath him.
>
> Several officers were trying to get that arm out.  I went to the north of him, which would be where his head was at, and struck him two or three times in the back of the head with a stun gun to get him to release that arm.  (Phillips depo. 16)

Phillips avers, "The transcript does not accurately reflect what I said at my deposition, as I can state unequivocally and without reservation that I had nothing in my right hand at the time I struck the plaintiff in an attempt to get him to reveal his right arm.  What I actually said at the deposition is, '...and struck him two or three times in the back of the head to stun him to get him to release that arm.' " (Phillips aff.)

Phillips submitted a correction to the deposition which provides the correction to page 16 as stated immediately above. (Doc. 74 Ex. 4 at 69)

Phillips was asked in his deposition, "Now, my client is already on the ground when you admit to hitting him in the head at least two times, correct?"  He responded. "Yes."

4

Phillips was then asked what other options were available to him to effect the arrest other than physical violence.  Phillips responded,

> With my location towards his head, there were not hardly any other options to use because of the number of people that were in close proximity.  I did have a taser with me but determined that it was just too close for me to use and it was too close to his head for a taser to be used on his head or neck area.

(Phillips depo. 21)

Medina County Sheriff's deputy Kevin English submits his affidavit wherein he avers that he participated in the apprehension of plaintiff and was within several feet of Phillips.  He "can state unequivocally that [Phillips] did not have a taser in his right hand when I was observing him striking" plaintiff. (English aff.)

Phillips acknowledged at deposition that information was being relayed to him during the standoff by officers stationed on a nearby hill who could see plaintiff inside the car and that he smoked cigarettes and consumed beer. Information was not relayed whether or not a gun could be seen when plaintiff exited the car. Phillips testified that he knew plaintiff had a weapon on him and he repeatedly testified that there was a strong possibility that plaintiff had access to a firearm and could have had it concealed on his body when he exited the car. Phillips also testified that plaintiff resisted the officers by failing to bring his right arm out from underneath him once he was on his stomach on the ground.  Phillips believed that plaintiff had a gun and that it could have been in his waistband or pocket. Plaintiff continued to not comply with the officers's orders to release his right arm from underneath his body. (Phillips depo. 16-56) A later inventory of plaintiff's car revealed a semi-automatic hand gun on the front console between the front two seats. The pistol was cocked, the safety was off,

and bullets were in the magazine. (*Id.* 20, Ex. 2)

Ohio State Highway Trooper Alan Dunbar testified that he was also dispatched to the scene.  When he arrived, plaintiff was still in his vehicle.  Plaintiff then got out and began to urinate on the cement.  Dunbar did not talk to any of the other officers on the scene, or request permission from any of the other officers, prior to tackling plaintiff and taking him to the ground as plaintiff stood by the side of his vehicle door urinating. Dunbar stated that after he tackled plaintiff, he "disengaged and walked away" because he "needed to de stress." (Dunbar depo. 6-10)

Defendant Ohio State Highway Patrol Trooper Schell submits his declaration which states the following. He is certified as a canine handler whose canine partner's name is Jimmy.  While driving to the site of the standoff involving plaintiff, he learned through radio communication that plaintiff was suspected of armed robbery and attempted kidnapping.  It was his understanding that plaintiff had held up a gas station clerk at gun point and had attempted to kidnap her. He was barricaded in his vehicle on Interstate 76 which was being closed down.  After arriving, Schell was informed that plaintiff was not communicating with police on the scene and that attempts for negotiation had been ongoing for 20 to 30 minutes. Schell was also informed that plaintiff was suspected to be suicidal, and possibly intended to harm his wife. About 10 minutes after he arrived, plaintiff exited his vehicle and stood facing away from the officers with his hands in front of him near his waistband. The officer on a loud speaker gave plaintiff commands to walk backwards slowly with his hands in the air. Plaintiff did not comply and Schell believed he might be attempting "suicide by cop." Schell decided to get Jimmy out of his vehicle to deploy for an apprehension of plaintiff. Schell informed two

6

officers that he needed cover and made a loud verbal command to plaintiff: "Police Department Canine Unit, slowly raise your hands above your head and walk backward to the sound of my voice, or I'll send my dog.  If I send my dog he will bite you."  Schell believed plaintiff had a weapon and continued to disobey officers's commands to show his hands. Schell saw no reaction by plaintiff to his verbal command. Plaintiff remained with his back towards the officers and his hands out of sight by his waistband. As Schell started to give a second command, Sergeant Dunbar rushed and tackled plaintiff. Schell then moved forward with Jimmy and joined other officers in assisting to apprehend plaintiff. Plaintiff was lying on his abdomen and Jimmy was barking at him and near his head and neck. Schell observed that plaintiff's right arm was under his body and officers were attempting to get his hand out. Schell was concerned that plaintiff was armed and resisting arrest by not giving up his hand. Schell commanded: "Stop resisting!  Put your hands behind your back or my dog will bite you!" Plaintiff did not comply. Schell decided to use Jimmy as a pain compliance tool and commanded him to apprehend plaintiff. Jimmy bit into plaintiff's right leg. Plaintiff resisted by kicking Jimmy and moving his right leg despite Schell's commands to stop resisting. Once plaintiff's hands were secured in handcuffs, Schell gave Jimmy a command to release plaintiff's leg, but he would not do so because of plaintiff's continued resistance. Schell then took out his gag-stick and placed it in Jimmy's mouth and Jimmy released the bite. (Schell decl.)

Wadsworth Police Officer Andrew Blubaugh, who was also involved in the arrest, testified that after seeing the other officer striking plaintiff in the head without gaining control over his hands, he applied his taser three times to strike plaintiff in the right arm, the

7

waistline, and right trapezoid. He applied each successive strike in an attempt to gain control of plaintiff's right arm as plaintiff was not complying with the orders to give up his right hand. (Blubaugh depo. 34-54, 65)

Ohio State Highway Patrol Trooper James Baker submits his declaration. He is a canine handler and was present during the standoff. Prior to arrival on the scene he learned through radio communication that plaintiff was suspected of armed robbery and attempted kidnapping. He understood that plaintiff had held up a gas station clerk at gun point. In response to the multiple commands by the officers to plaintiff once he exited his vehicle to show his hands, plaintiff put at least one of his hands up briefly but failed to keep them up and visible. Once on the ground, Baker observed that plaintiff was conscious and the officers were ordering him to give up his hands. Plaintiff was not complying. (Baker decl)

Two videos of the March 30, 2016 incident are submitted to the Court: A video taken from the police cruiser assigned to Seville Police Officer Earl Fockler (Doc. 75 Ex. A) and a video taken from the police cruiser assigned to Seville Police Officer Scott Phillips (Doc. 75 Ex. B). It is difficult to see any of the events in video B due to the placement of the police cars. Video A is not obscured. The entire incident from the takedown of plaintiff until the dog was released occurred over about 39 seconds.

This matter is now before the Court upon defendant Officer Samuel Scott Phillips's Motion for Summary Judgment and defendant Trooper Chad Schell's Motion for Summary Judgment.

## **Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and

the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir.1993).  The nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

### Discussion

The only claim that remains pending is the § 1983 claim of excessive force against Schell and Phillips. Although the Amended Complaint also asserts assault and battery (Count One), plaintiff does not dispute that the claim is barred by Ohio's one year statute of limitations. Additionally, wanton and reckless conduct (Count Three) is not a claim in itself.

To prevail on a § 1983 claim, the plaintiff must prove 1) the deprivation of a right secured by the Constitution or laws of the United States which was 2) caused by a person acting under the color of state law. *Winkler v. Madison County*, 893 F.3d 877 (6th Cir. 2018) (citations omitted). Where, as here, the individual defendants assert qualified immunity, the government officials may not be held liable if 1) the officers did not violate any constitutional guarantees or 2) the guarantee, even if violated, was not clearly established at the time of the alleged misconduct. *Arrington-Bey v. City of Bedford Heights,* 858 F.3d 988 (6th Cir. 2017) (citations omitted). *See also Maye v. Klee*, 915 F.3d 1076 (6th Cir. 2019) (citing *Morgan v. Fairfield Cty.*, 903 F.3d 553, 560 (6th Cir. 2018) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) ("In analyzing whether an official is entitled to qualified immunity, we must make two determinations: first, whether the plaintiff's version of the facts alleges the deprivation of a constitutional right; and second, whether that right was clearly established

10

such that a reasonable official would have known his actions were unconstitutional.")
Additionally, as to whether the guarantee violated was "clearly established" at the time of the
alleged misconduct, "a plaintiff must identify a case with a similar fact pattern that would
have given 'fair and clear warning to officers' about what the law requires." *Arrington-Bey,
supra* (citing *White v. Pauley*, 137 S.Ct. 548 (2017)).

"Claims of excessive force in the course of an arrest implicate an arrestee's Fourth
Amendment right to be free from unreasonable searches and seizures." *Estate ov Collins v.
Wilburn*, 755 Fed.Appx. 550 (6th Cir. 2018). "Whether the force was excessive turns on its
objective reasonableness under the totality of the circumstances." *Baxter v. Bracey,* 751
Fed.Appx. 869 (6th Cir. 2018) (citations omitted) As succinctly stated:

> Excessive force claims are analyzed under the Fourth Amendment's reasonableness
> standard. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). This standard
> encompasses "a built-in measure of deference to the officer's on-the-spot judgment
> about the level of force necessary in light of the circumstances of the particular case."
> *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. Ohio 2002) (citing *Graham,* 490 U.S.
> at 396). It "allow[s] for the fact that police officers are often forced to make
> split-second judgments – in circumstances that are tense, uncertain, and rapidly
> evolving—about the amount of force that is necessary in a particular situation."
> *Graham*, 490 U.S. at 396-97. "An officer should be entitled to qualified immunity if
> he made an objectively reasonable mistake as to the amount of force that was
> necessary under the circumstances with which he was faced." *Solomon v. Auburn Hills
> Police Dept*., 389 F.3d 167, 175 (6th Cir. 2004) (citation omitted). The factors
> considered in assessing a constitutional excessive force claim include the particular
> facts and circumstances of each case, the severity of the crime, the threat posed by the
> suspect, and whether the suspect is "actively resisting arrest or attempting to evade
> arrest by flight." *Graham*, 490 U.S. at 396. "The 'reasonableness' of the particular use
> of force must be judged from the perspective of a reasonable officer on the scene,
> rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

*Howse v. Hodous,* 2019 WL 1509139 (N.D.Ohio April 5, 2019).

As each defendant's liability must be analyzed separately based on his own actions,

*Binay v. Bettendorf,* 601 F.3d 640 (6ᵗʰ Cir. 2010) (citations omitted), the Court will consider each motion individually.

**(1) Defendant Officer Samuel Scott Phillips's Motion for Summary Judgment**

The only conduct attributed to Officer Phillips is the strikes to the back of plaintiff's head.  The Amended Complaint alleges that while plaintiff "was face down," Phillips "repeatedly punched the plaintiff in the head."  (Am. Compl. ¶ 12)  As plaintiff has no recollection of the events of this period of time, the Court looks to the affidavits and deposition testimony of Phillips and the other officers, as well as the video recording.

Defendant Phillips maintains that the force he used was objectively reasonable under the totality of the circumstances. He had information that plaintiff had committed a serious crime, i.e., armed robbery.  Plaintiff was non-compliant with the officers's demands as he sat drinking in his vehicle.  He continued to be non-compliant by not keeping his hands in the air once he exited the vehicle and then, after he was on the ground, by failing to release his right arm despite officer demands. Not only did Phillips have information that plaintiff had a gun, but also that he was depressed, potentially suicidal, and intoxicated.  Phillips also points out that there was no discernible injury from the two to three strikes and the force was *de minimus.*  In fact, the strikes administered by Phillips failed to cause plaintiff to stop resisting and he only complied by allowing himself to be handcuffed after being tased by another officer and bitten by the canine.  Moreover, it is not disputed that none of the officers had any forewarning that Trooper Dunbar would charge onto the scene and tackle plaintiff to the ground. This unanticipated action caused all the officers, including defendant Phillips, to react immediately. And, because Dunbar quickly stepped away once plaintiff was on the ground,

Phillips, who was first to the scene, had to make split-second decisions to apprehend a potentially armed suspect.

Plaintiff argues that issues of fact preclude summary judgment and that Phillips's conduct was not objectively reasonable.

Plaintiff maintains that Phillips's deposition testimony, attempted to be corrected via affidavit, regarding whether or not he struck plaintiff with his hand or a stun gun is an issue of fact. Furthermore, plaintiff asserts that the deposition testimony of his liability expert, Ernest Burwell, states that there was a round mark or bruise on plaintiff's neck which Phillips could not explain. (Doc. 84 at 8)[4]

Additionally, plaintiff repeatedly points out that Phillips acknowledged at deposition that the officers on the hill who were observing plaintiff did not communicate that he exited the car with a gun. Nor, plaintiff asserts, was there evidence that plaintiff had a gun when he was tackled to the ground. Plaintiff maintains that the video appears to show that upon hitting the ground, plaintiff was not holding a gun. Moreover, Phillips testified that plaintiff did not use a deadly weapon in attempting to interfere with his arrest or brandish a weapon in doing so. Phillips acknowledged that the only intentional act that plaintiff did in hindering his arrest was to fail to release his right arm from underneath his body.

Plaintiff argues that it is clearly established that hitting a restrained suspect in the head is excessive force. Plaintiff points to *Bultema v. Benzie County,* 146 Fed.Appx. 28 (6th Cir. 2005), *Phelps v. Coy,* 286 F.3d 295 (6th Cir. 2002), and *Davis v. Bergeon*, 1999 WL 591448

---

[4]     As discussed more fully below, plaintiff does not submit Burwell's deposition, but only what appears to be an unsworn expert report.

13

(6th Cir. July 27, 1999).

Finally, plaintiff maintains that he was merely "passively resisting" arrest while not "actively resisting" which calls for significantly less force. He asserts that he was only noncompliant and resisting handcuffing. Plaintiff points out that Phillips repeatedly testified that plaintiff did nothing aggressive other than possibly having a gun on his person and failing to release his right arm from underneath his body.

For the following reasons, the Court finds that defendant Phillips is entitled to qualified immunity because his actions were objectively reasonable under the totality of the circumstances. After more than 45 minutes, defendant Phillips was "forced to make split-second judgments" following the unanticipated tackling of plaintiff by Trooper Dunbar. Once on the ground, the entire episode lasted only 39 seconds until plaintiff was handcuffed. With the certain information that plaintiff had used a gun in an armed robbery, was emotionally unstable, and was even potentially suicidal, the circumstances were clearly "tense, uncertain, and rapidly evolving." Phillips testified repeatedly that there was a strong possibility that plaintiff had access to a firearm; his "thought process" was that "he's got a gun. He has a gun." Plaintiff makes much of Phillips's testimony acknowledging that officers stationed on the nearby hill did not communicate that plaintiff had a gun when he exited the vehicle. This did not dispel Phillips's belief, like any reasonable officer would have had, that the gun could have been concealed on plaintiff's person. Phillips testified that he believed plaintiff could have had a firearm tucked in his waistband or in his pocket. He testified, "We were all in danger of him having the possibility of a firearm and him discharging that." While plaintiff was outside his vehicle he remained with his back to the officers and refused

14

commands to walk backwards slowly with his hands in the air. Once tackled to the ground and after Dunbar stepped away, Phillips testified that plaintiff kept his right arm underneath his body and refused commands to remove the right arm. (Phillips depo.16-64) Thus, while plaintiff raised his hands briefly while he stood outside his vehicle and a gun was not seen in his hands, plaintiff remained with his back to the officers and it would have been reasonable to assume that a gun was concealed in his waistband or pocket.

In fact, all the officers testified that plaintiff refused to release his right arm thereby giving him access to a gun. Officer Blubaugh testified that plaintiff failed to follow the commands and resisted the officers' "pull on his right arm to gain free. The hands hold weapons."  (Blubaugh depo. 27-28) Defendant Schell testified that plaintiff would not expose his right hand and kept it underneath his body. (Schell depo. 29. 32, 58, 82) Deputy Kevin English testified that once on the ground plaintiff failed to comply with commands to show his hands. (English depo.21-22)

Clearly, there was a reasonable basis to believe that plaintiff was armed and that having his right arm underneath his body posed an imminent and specific threat to Phillips, the other officers, and plaintiff himself.  The threat was unabated until plaintiff's hands were secured in handcuffs behind his back. The fact that the firearm was subsequently found on the front seat of plaintiff's vehicle is precisely the "20/20 vision of hindsight" that the Court is not permitted to use in judging the officers on the scene.

Plaintiff's attempt to raise an issue of fact as to the three strikes administered by Phillips is unavailing. First, Phillips corrected his deposition testimony to clarify that he struck plaintiff with his hand and not a stun gun.  Plaintiff has no recollection of the event and has no

15

evidence to dispute this.  Moreover, Phillips testified elsewhere in his deposition that he had his taser with him but he declined to use it under the circumstances.  And, Officer Kevin English stated in his affidavit that Phillips did not have a taser in his hand when he observed him striking plaintiff. Second, plaintiff attempts to raise an issue of fact by pointing to Ernest Burwell's deposition testimony that there was a round bruise on plaintiff's neck which is unexplained.  But, plaintiff did not file the deposition of his expert.  Regardless, this does not create an issue of fact as to whether or not Phillips used his hand in striking plaintiff.

Plaintiff states that his expert Burwell testified that it is "not best practice to strike anyone in the back of the head with any type of instrument, tool, weapon, or a closed fist unless it's an immediate life-threatening situation."  (Doc. 84 at 9) Again, the deposition is not filed.  Even if it were filed, Burwell seems to concede that the action would be appropriate in "an immediate life-threatening situation."  That existed here where plaintiff posed a threat to everyone present with the real possibility that he had a gun. Phillips testimony and the video establish that he administered three quick strikes to the head to get plaintiff to comply. Phillips testified that the strikes were intended to illicit a response of compliance by plaintiff which did not happen. Considering the severity of the crime at issue (armed robbery), the threat posed by plaintiff (all officers reasonably believed he had a gun), and the fact that plaintiff was resisting arrest by refusing to release his right arm to be handcuffed, the three quick strikes were not excessive.

Plaintiff argues that the force was excessive based upon the video. Plaintiff states in his brief, "Also, ... as depicted on the video Officer Phillips admitted that it appears that upon hitting the ground my client isn't holding a gun or that he didn't throw a gun away."  (Doc. 84

16

at 7) The Court, however, must view the circumstances from the perspective of the officer on the scene.  All the officers testified that plaintiff refused to remove his right hand from underneath his body and that he was likely concealing a weapon. In the chaos following the tackling of the plaintiff to the ground, only seconds transpired.  The Court only considers what Phillips perceived in those seconds and does not rely on a parsing of the video.

The case law plaintiff relies on is inapposite because plaintiff was not restrained at the time that Phillips administered the three strikes, and any reasonable police officer would consider him a threat given the likelihood that he had a gun on his person when he exited the car.

In *Phelps v. Coy,* 286 F.3d 295 (6th Cir. 2002), taking the facts in the light most favorable to the plaintiff, the officer was not entitled to qualified immunity.  Plaintiff was taken to the police station for booking for violation of an open container ordinance.  While handcuffed, one officer instructed plaintiff to remove his shoes and lift his feet. In doing so, one of plaintiff's feet got close to the face of one of the officers who grabbed the foot and pushed it away.  The second officer saw the incident and construed it as an attempt at kicking the officer.  The second officer tackled plaintiff to the ground, while still handcuffed, and got on top of the plaintiff.  He hit plaintiff in the face twice and banged his head into the floor at least three times.  There was no evidence that plaintiff posed a threat to either officer.

In *Davis v. Bergeon*, 1999 WL 591448 (6th Cir. July 27, 1999), taking plaintiff's version of the facts which were "starkly different" from the officer's version, the court could not say as a matter of law that the officer's actions were objectively reasonable. Plaintiff had gone to a lounge which, unbeknownst to him, was under investigation for various crimes. The

17

police had planned a raid and various plainclothes officers entered the lounge.  When plaintiff attempted to enter the men's room, a plainclothes officer, who plaintiff thought was a security guard, ordered plaintiff to drop to the ground.  When plaintiff did not comply, he was struck in the head with an asp baton. The court found that a reasonable jury could conclude that this constituted excessive force.

Likewise, in *Bultema v. Benzie County,* 146 Fed.Appx. 28 (6th Cir. 2005), the court found excessive force where plaintiff was pepper sprayed after he was handcuffed and then hit in the head. The court stated, "It is beyond doubt that the act of a police officer hitting a restrained suspect in the head is excessive force."

Furthermore, although it is not necessary to consider defendant's expert's report (which is incorporated by affidavit), Faulkner's opinion buttresses the Court's finding.  In particular, he states that plaintiff "could have removed a weapon from his waistband and used that weapon against any of the officers that were around him."  (Doc. 87 Ex. A at 17) He opined that "it was critical of officers to control [plaintiff's] right hand and consider this to be a potentially deadly force situation until [plaintiff's] right hand could be cleared and controlled." (*Id.)*  And, defendant Phillips's "strikes to [plaintiff's] upper back, raps to the back of his head or the use of pressure point control tactics would be consistent with the officer's training and reasonable in relation to the risk that [plaintiff] presented and the limited availability of other options." (*Id.* 18) (Samuel D. Faulkner rept.)

Finally, plaintiff attempts to argue that he was merely "passively resisting" arrest because he was only refusing to be handcuffed. The Court disagrees. Considering that the officers reasonably believed plaintiff had a gun, plaintiff's actions were not merely passive.

For the above reasons, the Court finds that the force applied by defendant Phillips (three strikes to the back of the head) was reasonable under the totality of the circumstances and did not violate any clearly established constitutional right.  In sum, all factors weigh in defendant Phillips's favor, namely:  the particular facts and circumstances of this case (plaintiff was known to be emotionally unstable and engaged in a standoff with police for almost an hour), the severity of the crime (armed robbery), the threat posed by the suspect (he likely had a gun concealed on himself), and whether he was actively resisting arrest (he refused to release his right arm to be handcuffed). Therefore, defendant Phillips is entitled to qualified immunity.

**(2) Defendant Trooper Chad Schell's Motion for Summary Judgment**

Defendant Schell maintains that his actions were objectively reasonable under the standard discussed above given that he reasonably believed that plaintiff was armed and a threat to himself and the other officers.  Plaintiff was an armed robbery suspect who disregarded police orders to exit his vehicle for almost an hour and was potentially suicidal. Plaintiff was armed when he got into his car after robbing the gas station and every officer reasonably believed he was still armed when he exited his car. After plaintiff was taken to the ground, defendant Schell was justifiably concerned for his safety when plaintiff refused to show his right arm. Plaintiff's right hand was in a position in which the officers could not determine if it held or was reaching for a weapon.  Moreover, given the fast moving and somewhat chaotic (and brief) resolution to the standoff, defendant Schell argues that his actions were justified. Additionally, once plaintiff's hands were secured in handcuffs, the use of force against him terminated.

19

Defendant Schell also asserts that the deployment of his canine falls within the reasonableness standard under Sixth Circuit precedent for the deployment of canines:

> Sixth Circuit decisions demonstrate that there is a continuum of permissible versus impermissible use when it comes to police dogs. On the permissible end of that spectrum are cases wherein officers deploy properly trained police dogs to locate individuals who were believed to be involved in nefarious criminal activity, who may have been armed and dangerous, and who failed to surrender or respond in any manner after officers gave several warnings. *Robinette v. Barnes*, 854 F.2d 909 (6th Cir. 1988); *Matthews v. Jones*, 35 F.3d 1046 (6th Cir. 1994). On the other end of that spectrum lies a case in which a canine officer allowed a little-trained police dog to get close enough to a subject of a track to bite the subject despite the fact that the subject had already been subdued and placed in handcuffs. *See White v. Harmon*,1995 WL 518865 (6th Cir. 1995).

*Campbell v. City of Springboro, Ohio,* 788 F.Supp.2d 637 (S.D.Ohio 2011).  Defendant argues that district court cases in this circuit, *Ziolkowski v. City of Taylor*, 2013 WL 3872507 (E.D.Mich. July 24, 2013) and *Phipps v. Goecker*, 2012 WL 2367166 (E.D.Mich. June 21, 2012), also support the reasonableness of his actions.         .

Defendant Schell argues that like the officers in the *Robinette, Matthews*, *Ziolkowski*, and *Phipps,* he deployed Jimmy against a suspect he believed was armed and dangerous, and who had failed to surrender or show his hands after he was given several warnings. Defendant Schell warned plaintiff that he would send the dog if plaintiff continued to disregard the police orders and again when plaintiff failed to give up his right hand from underneath his body. Defendant Schell asserts that he is entitled to qualified immunity given that he was forced to make quick decisions in deploying Jimmy during a chaotic and changing situation. Plaintiff had shown no willingness to comply with the police orders for almost an hour, with his hands consistently at his waistband.  When defendant Schell ordered Jimmy to engage, plaintiff's right hand was obscured.

20

Plaintiff argues that defendant Schell acted unreasonably given that he testified that plaintiff was only noncompliant because he was not following the orders given by the police. Defendant Schell admitted that he could not describe any aggressive acts taken by plaintiff while he was standing near the car urinating or when he was down on the ground. Defendant Schell testified that he did not see plaintiff brandish a weapon or make any verbal threats. He testified that plaintiff did not offer resistance other than not exposing his right hand. Defendant Schell also testified that he did not see a weapon on plaintiff and acknowledged at deposition that he did not see plaintiff acting violently toward any of the officers. Plaintiff asserts that there are issues of fact because defendant Schell testified that the dog did not go to plaintiff's neck and yet, the medical records show superficial bites to the neck. Finally, plaintiff maintains that he was merely resisting handcuffing which constitutes passive resistance and warrants lesser force.

For the following reasons, the Court finds that defendant Schell is entitled to qualified immunity.

Like the discussion in Phillips's motion, above, the Court weighs certain factors in assessing whether the force used was excessive or was objectively reasonable. Again, the factors weigh in defendant Schell's favor as to the severity of the crime and the threat posed by plaintiff. As defendant Schell points out, plaintiff's brief seems only to dispute the last factor, i.e., whether he was "actively resisting arrest." Plaintiff maintains that there is a difference between active and passive resistance, and noncompliance. However, plaintiff only asserts that he was passively resisting arrest because no one testified that he brandished a weapon or made a violent movement, and so he posed no safety threat because he was only

being noncompliant.  As discussed above, however, any reasonable police officer would have objectively perceived plaintiff to be actively resisting arrest.  Considering Trooper Dunbar's unannounced takedown of plaintiff who was believed to have a gun, defendant Schell had to engage in split-second decisions. Plaintiff's refusal to pull his right arm from under him despite commands to do so amounts to active resistance where a reasonable police officer would have believed he had access to a gun on his person, he had refused to exit his vehicle for 50 minutes following a traffic stop for armed robbery, and he had refused to obey police orders to put and keep his hands up and walk backwards toward the police once out of the vehicle.  As discussed above, all officers knew plaintiff was an armed robbery suspect and that he disobeyed all commands including freeing his right arm from underneath himself once on the ground. Additionally, the undisputed evidence shows that defendant Schell gave a warning to plaintiff to remove his right arm from under him or he would be bitten by the dog. When plaintiff did not comply, defendant Schell moved towards plaintiff's leg and commanded Jimmy to apprehend him. The dog reengaged after plaintiff resisted Jimmy on his leg.

Defendant Schell argues that plaintiff's possession of a weapon and repeated failure to comply with police commands necessitated the use of force to resolve the standoff without any loss of life.  He asserts that by robbing the Wayfair Market at gunpoint and repeatedly failing to obey police orders, plaintiff created a volatile and dangerous situation.  This Court agrees.  Schell's deployment of Jimmy was a reasonable response to the severity of the threat that he and the other officers faced. As discussed above, all officers testified to plaintiff's refusal to obey orders once out of his vehicle and on the ground, and his refusal to pull his right arm out from underneath him despite commands to do so.

Sixth Circuit precedent supports this conclusion. In *Robinette,* a burglary suspect was killed by the police dog. The court concluded that the use of force was not unreasonable where the suspect had been warned and remained hidden inside a darkened building in the middle of the night so that he threatened the safety of the officers.  In *Matthews,* the plaintiff did not stop his vehicle in response to a pursuing police officer who believed that plaintiff was speeding and driving recklessly.  The court concluded that plaintiff's § 1983 claim failed where plaintiff fled from his car into a densely wooded area in the dark of night in an attempt to evade the police, and the darkness "provided a strategic advantage to [plaintiff] in that he could easily ambush the officers."  Additionally, plaintiff's "extreme behavior" indicated that plaintiff was probably involved in "activity considerably more nefarious than mere traffic violations."  Thus, the court found that a reasonable police officer would have believed that plaintiff posed a threat to the officers' safety. Like these cases, plaintiff was believed to be armed and dangerous, and refused commands to surrender his hand which put the officers in peril. In contrast, *White* involved the use of the dog with little training where the plaintiff had already been apprehended and handcuffed.  Therefore, the force was considered unreasonable.

The district court cases are in accord. In *Ziolkowski*, the plaintiff, a combat veteran suffering from P.T.S.D., lost touch with reality and began pointing a rifle at neighbors and smashing windows. When officers arrived, plaintiff got into his van and drove it into a police car at a high speed.  After plaintiff exited his vehicle, he refused orders to get down.  Plaintiff was tased but still did not react.  He was then taken to the ground, but refused to put his hands behind his back and continued to struggle. Plaintiff was warned that if he did not give up his hands, the police dog would be sent in.  He continued to struggle.  The dog was sent and bit

plaintiff's leg. Plaintiff continued to resist and was again warned to stop resisting or the dog would be sent in. When plaintiff continued to resist, the dog again bit him. After a few more seconds of struggle, plaintiff was then able to be handcuffed. The court concluded that excessive force was not used and use of the dog was objectively reasonable under Sixth Circuit case law:

> [T]the first two factors—the severity of the crime at issue, and whether the suspect poses an immediate threat to the safety of the officers or others—clearly favor the reasonableness of [defendant's] use of force in this case. The officers had reason to believe that the crime involved was serious and that the plaintiff posed a substantial threat of harm to officers and bystanders. Moreover, as discussed above, the evidence demonstrates that the plaintiff was resisting arrest and handcuffing by the officers.

> Likewise, in *Phipps*, the court found the use of the canine reasonable.  Plaintiff broke into an elementary school and ran when the alarm was tripped and the police responded. After being chased, plaintiff chose to lay face down in the snow with his hands underneath him. Police sent the dog ahead to apprehend plaintiff and he did so by grabbing plaintiff's shoulder and then biting his ear when plaintiff pushed the dog away. Applying the Sixth Circuit precedent in *Robinette* and *Matthews,* the court granted summary judgment to defendant where the police did not know whether plaintiff, a fleeing felon, was armed and his hands were underneath him and not visible to the officers.

> Plaintiff argues that "this case is replete with credibility issues."  (Doc. 83 at 11)  But, plaintiff only points to defendant Schell's deposition testimony that Jimmy did not go to plaintiff's neck and yet the nurse's notes show that plaintiff had superficial bites to the neck. The Court agrees with defendant that this amounts to a "mere scintilla" and does not create any genuine issue of material fact precluding summary judgment. First, in the chaos of the

24

mere seconds when Jimmy was deployed, the fact that defendant Schell may not have seen or remembered Jimmy at plaintiff's neck in not consequential.  The video shows that Jimmy did initially approach plaintiff's head.  Second, defendant points out that while the medical records show one note from a nurse stating that there were superficial bites to the back of the neck, the medical records as a whole show a diagnosis of a dog bite to the lower leg. (Doc.  86 Ex. I) Third, to the extent plaintiff utilizes his expert Ernest Burwell to establish an issue of fact as to where Jimmy bit plaintiff (or to establish any other facts or opinions), plaintiff cites to Burwell's deposition which he did not file.  Additionally, plaintiff attaches what appears to be Burwell's expert report.  But, the report is not sworn to and, thus, is not properly before the Court. *Shaffer v. CSX Transp., Inc.,* 462 Fed.Appx. 597 (6th Cir. 2012) (Unsworn expert reports are hearsay and may not be considered on a motion for summary judgment.)

Moreover, for the reasons stated by defendant Schell, Burwell's report, even if considered, improperly offers opinions based on his interpretation of the dash cam video and makes other unsupported assertions such as concluding that plaintiff did not resist the officers.

For all the foregoing reasons, the Court finds that defendant Schell's deployment of Jimmy was reasonable under the totality of the circumstances and did not violate any clearly established constitutional right.  In sum, all factors weigh in defendant Schell's favor, namely: the particular facts and circumstances of this case (plaintiff was known to be emotionally unstable and engaged in a standoff with police for almost an hour), the severity of the crime (armed robbery), the threat posed by the suspect (he likely had a gun concealed on himself), and whether the suspect was actively resisting arrest (he refused to turn over his right arm to be handcuffed).  Additionally, the use of the canine was reasonable under Sixth Circuit

precedent. Therefore, defendant Schell is entitled to qualified immunity.


**<u>Conclusion</u>**

For the foregoing reasons, defendant Officer Samuel Scott Phillips's Motion for Summary Judgment and defendant Trooper Chad Schell's Motion for Summary Judgment are granted.

IT IS SO ORDERED.



        /s/Patricia A. Gaughan
        PATRICIA A. GAUGHAN
        United States District Court
Date:    5/07/19    Chief Judge

26